UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Russell L. Wakkinen,

       Plaintiff,

v.

                                            Civ. No. 04-4368 (JNE/SRN)
                                            ORDER

UNUM Life Insurance Company of America and
UNUMProvident Corporation,

       Defendants.

---

Denise Y. Tataryn, Esq., and Andrew T. Jackola, Esq., Mansfield, Tanick & Cohen, P.A., appeared for Plaintiff Russell L. Wakkinen.

Terrance Wagener, Esq., Krass Monroe, P.A., appeared for Defendants UNUM Life Insurance Company of America and UNUMProvident Corporation.

---

Russell Wakkinen brought this action against UNUM Life Insurance Company of America and UNUMProvident Corporation (collectively, UNUM) to recover long-term disability (LTD) benefits under a plan offered by his former employer, RSM McGladrey (RSM), pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2000). The case is before the Court on UNUM's Motion for Summary Judgment, UNUM's Motion to Strike, and Wakkinen's Motion for Summary Judgment. For the reasons set forth below, the Court grants UNUM's Motion for Summary Judgment, denies UNUM's Motion to Strike, and denies Wakkinen's Motion for Summary Judgment.

## I. BACKGROUND

Wakkinen is a certified public accountant. Beginning in 1994, he worked for RSM as a senior manager business consultant. In that capacity, he worked forty to sixty hours per week performing financial and operational business consulting for RSM clients.

**A.      The Policy**

During his employment, Wakkinen became insured under a group LTD insurance policy (Policy) issued by UNUM.  To be entitled to benefits under the Policy, Wakkinen was required to submit a proof of claim:

> Your proof of claim, provided at your expense, must show:
>
> -      that you are under the regular care of a physician;
> -      the appropriate documentation of your monthly earnings;
> -      the date your disability began;
> -      the cause of your disability;
> -      the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
> -      the name and address of any hospital or institution where you received treatment, including all attending physicians.

The Policy defines "disability" as follows:

> You are disabled when Unum determines that:
>
> -      you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> -      you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

The Policy defines "material and substantial duties" as duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified."

Under the Policy, prior to receiving benefits, each insured is required to satisfy an elimination period.  The Policy states:

> You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period.  The days that you are not disabled will not count toward your elimination period.
>
> Your elimination period is 180 days.

According to the Policy, payments stop and an insured's claim ends on the earliest of the following events:

- during the first 60 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;
- after 60 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability;
- the date your disability earnings exceed the amount allowable under the plan;
- the date you die.

The Policy defines "part-time basis" as "the ability to work and earn 20% or more of your indexed monthly earnings."

**B.      Treatment history**

Wakkinen has a history of fibromyalgia and depression.  The record reveals that he was diagnosed with fibromyalgia in February 1998 and began treating regularly with medication for major depressive disorder in 1999.  Although he had some flares of both conditions between 1998 and 2001, the symptoms were sufficiently controlled such that Wakkinen could work until late 2001.  Wakkinen alleges that his symptoms worsened in late 2001.  On December 3, 2001, he visited his psychiatrist, Joseph Bebchuk, M.D., on an urgent basis.   During that visit, Wakkinen reported that he was feeling increasingly depressed and that he had a crisis earlier that day following completion of his time sheets for work.  Wakkinen realized that he had not really worked during the previous two months and that he had been hiding his depressive symptoms. He further reported that he was no longer able to work; take care of his basic needs, such as hygiene; or perform housework.   On the basis of the visit, Dr. Bebchuk determined that Wakkinen's major depressive disorder had recurred and that it was of moderate severity.  After Dr. Bebchuk discussed with Wakkinen his condition and options, Wakkinen decided to apply for short-term disability benefits.  Dr. Bebchuk supported the application.

3

Wakkinen continued to treat with Dr. Bebchuk on a monthly basis through June 2002. In January and February 2002, Dr. Bebchuk noted that Wakkinen struggled with lack of energy, interest, motivation, and ability to function. He described Wakkinen's depression as severe and supported Wakkinen's claim for short-term disability benefits. As of March 2002, Dr. Bebchuk's office notes reflect that Wakkinen started to improve. Although he continued to support Wakkinen's claim for short-term disability, Dr. Bebchuk described Wakkinen's depression as "recurrent, in partial remission." Similarly, on April 8, 2002, Dr. Bebchuk concluded that Wakkinen was suffering from "major depressive disorder, recurrent, in partial remission." He noted that it was clear based on his evaluation that day that Wakkinen was not yet able to return to work. However, he also relayed that Wakkinen had reported that he was feeling a bit better and there were times where he had a lot more energy and was able to enjoy himself.

On May 20, 2002, Wakkinen returned to see Dr. Bebchuk. Dr. Bebchuk's office notes for that visit reveal that Wakkinen reported feeling better than he had in a long time; he was out doing things around the house, including yard work; and his ambition and fatigue were improving. In light of Wakkinen's activity level, Dr. Bebchuk believed that Wakkinen could return to work part-time and recommended that he do so. However, on May 28, 2002, Wakkinen called Dr. Bebchuk's office to express his concern about returning to work. Wakkinen indicated that he did not think his employer would be receptive to a part-time schedule. In response, Dr. Bebchuk insisted that Wakkinen speak with his employer about returning to work on a part-time basis temporarily, with the goal of working up to full-time. Wakkinen agreed to talk to his employer the next day. Three days later, Wakkinen again called Dr. Bebchuk. At that time, Wakkinen reported that he continued to feel depressed and that he had regressed somewhat from

his last visit such that he could not return to work even part-time.  On the basis of this telephone conversation, Dr. Bebchuk approved continued short-term disability through the end of June.

Wakkinen returned to see Dr. Bebchuk for a medication check on June 27, 2002.  Dr. Bebchuk noted that, since the last time he had seen Wakkinen, Wakkinen had received eight steroid injections in his back from Anne Brutlag, M.D., for treatment of his fibromyalgia.  Wakkinen reported feeling "wonderful" and having more energy and a better mood for approximately two-and-one-half to three weeks after the injections.  During that period, he felt better than he had in years.  Based on his evaluation, Dr. Bebchuk concluded that Wakkinen was suffering from "[m]ajor depressive disorder, recurrent, mild severity."  According to the administrative record, Wakkinen did not return to see Dr. Bebchuk until October 29, 2002.

During the same time period Wakkinen was treating with Dr. Bebchuk, he was also treating with a variety of other healthcare providers.  For instance, on January 9, 2002, Wakkinen visited his internist, Gregory Lehman, M.D.  During the visit, Wakkinen requested a disability slip for fibromyalgia.  Acknowledging that Wakkinen experienced some pain, Dr. Lehman nevertheless declined Wakkinen's request because Dr. Lehman believed that Wakkinen's fatigue and inability to work were attributable to psychiatric problems.  Dr. Lehman recommended that Wakkinen discuss disability with his psychiatrist.  Dr. Lehman further suggested that Wakkinen have a sleep study performed, which Wakkinen did on April 11, 2002.  The results of that study were inconclusive.

On May 28, 2002, Wakkinen also began treating with Dr. Brutlag for his fibromyalgia.  During his first visit, Wakkinen rated his pain as six to seven on a scale from zero to ten, with zero being no pain and ten being unbearable.  He indicated that he struggled greatly with his pain level, his fatigue, his overall endurance, and his energy level.  He also reported that he regularly

performed home exercises, including walking or biking for an average of an hour per day and an upper extremity weight program at least three times per week.  Dr. Brutlag concluded that Wakkinen had fibromyalgia, gave him trigger-point injections, and referred him to a lifestyle renewal program and to Karla Stormo, Ph.D., for pain management counseling.

Wakkinen returned to see Dr. Brutlag for his fibromyalgia on July 16, 2002.  In the interim, Wakkinen made an appointment with Alvaro Sanchez, M.D., a physician board-certified in internal medicine.  At his appointment with Dr. Sanchez on July 11, 2002, Wakkinen told Dr. Sanchez that he was receiving disability for his depression but that he wanted to change the reason for his disability from depression to fibromyalgia because by making this switch his benefits would last more than two years.  Dr. Sanchez did not write Wakkinen a disability slip and instead encouraged Wakkinen to remain very active.  Specifically, he recommended that Wakkinen participate in a daily program of fitness and keep himself busy with his work as a volunteer involving community issues.  Dr. Sanchez indicated that he did not believe that Wakkinen would be better off staying home being inactive.

At the July 16, 2002, visit with Dr. Brutlag, Wakkinen reported that his symptoms had improved substantially after receiving the trigger-point injections on May 28, 2002.  He reported that his energy level was improved, that he woke up in the morning feeling better, and that he was significantly more active.  He informed Dr. Brutlag that, notwithstanding the two-and-one-half to three-week relief, his symptoms were again escalating and rated his current pain at a seven to eight on a ten-point scale.  Wakkinen told Dr. Brutlag that he experienced occasional "fibro fog" or cognitive dysfunction, but Dr. Brutlag noted that Wakkinen was alert and very talkative on that particular day.  According to Dr. Brutlag, Wakkinen demonstrated a broad range of affect, as well as normal rate, rhythm, and intonation of speech.  He also followed three-part

instructions without difficulty.  He was tense but changed positions freely and without obvious discomfort.  Dr. Brutlag again noted that Wakkinen suffered from fibromyalgia and repeated trigger-point injections.

Wakkinen returned to see Dr. Brutlag for follow-up appointments regarding his fibromyalgia in August and September 2002.  At both appointments, Wakkinen reported that his trigger-point injections were of substantial benefit for approximately two to three weeks, but that, at the time of his appointment, his pain was at an eight or nine on a ten-point scale.  He also reported at those appointments that he was suffering greatly from fatigue.  Dr. Brutlag repeated trigger-point injections.  In October, Wakkinen reported that his pain level had been somewhat improved.  However, he also reported that his activity tolerance was worse than in the past and that he was severely fatigued.  Dr. Brutlag concluded that Wakkinen was totally disabled due to his fibromyalgia, severe chronic pain, and chronic fatigue and that Wakkinen had been totally disabled since August 1.  Dr. Brutlag opined that Wakkinen was likely to remain disabled through at least November 15, 2002.  Wakkinen returned to see Dr. Brutlag for follow-up appointments regarding his fibromyalgia on an approximately monthly basis through at least 2003. Dr. Brutlag has opined that Wakkinen was totally disabled through January 27, 2004.

Finally, Wakkinen treated regularly with a psychotherapist.  Initially, he treated with Jeffrey Nye, who, on March 6, 2002, observed that Wakkinen's mood was irritable, his affect was restricted, and he was suffering from severe major depressive disorder.  Thereafter, at Dr. Brutlag's recommendation, Wakkinen began treating with Dr. Stormo for pain management counseling.  His treatment with Dr. Stormo commenced on June 10, 2002.  At his June 10 appointment, Wakkinen rated his pain at four on a ten-point scale.  Based on her evaluation of Wakkinen, Dr. Stormo reported that Wakkinen's sleep disturbance, muscle tension, pacing

difficulties (overexertion followed by exhaustion), history of abuse, depression, and psychosocial stressors likely compromised Wakkinen's ability to cope with pain and likely increased his disability.  Dr. Stormo concluded that Wakkinen would benefit from a comprehensive, structured pain management program and recommended individual psychological sessions to address Wakkinen's depression/anxiety, psychological stressors, adjustment issues, abuse issues, and pacing difficulties.  Dr. Stormo diagnosed Wakkinen with a pain disorder; major depressive disorder, recurrent, moderate, with anxiety features; and adjustment disorder with mixed anxiety and depressed mood.  With some exceptions, Wakkinen continued to treat with Dr. Stormo approximately once or twice per month.  Dr. Stormo consistently diagnosed Wakkinen with major depressive disorder, recurrent, of moderate severity.

## C.      Benefits claim

Wakkinen submitted his claim for LTD benefits in April 2002.  When asked to describe the nature and details of his sickness and when it began, Wakkinen reported that he suffered from severe depression combined with fibromyalgia and chronic fatigue syndrome, which rendered him unable to work as of December 3, 2001.

Wakkinen's claim was assigned to Sylvia Duncan.  To assist with assessment of Wakkinen's claim, Duncan interviewed Wakkinen by telephone.  Wakkinen informed her that he received treatment for depression and fibromyalgia.  He indicated that fatigue was keeping him from doing his job.  Wakkinen identified Dr. Bebchuk as his psychiatrist and Dr. Lehman as his fibromyalgia doctor.

After obtaining medical records from Wakkinen's medical providers, Janice Deal, RNC, a clinical consultant, reviewed Wakkinen's submissions.  She reviewed Dr. Bebchuk's office notes from March 13, 2000, to June 27, 2002, and Dr. Stormo's office notes from June 10, 2002,

to July 16, 2002.  Based on her review of these records, Deal concluded that the diagnosis of major depression was supported by the information in the file; that the restriction of no work due to depression was supported from December 3, 2001, through April 8, 2002; and that Wakkinen was receiving appropriate treatment for his condition.  Deal opined that the restriction of no work was not supported past April 8, 2002.  She wrote:

> R/L's are supported from 12/3/01 through 4/8/02.  Medical information does not support claim past this time; the AP does not provide information identifying difficulty functioning in other areas of clmt's life, home, socially; a condition that is truly preventing functioning will affect more than one area of life.  Guidelines indicate that seeing a therapist is appropriate treatment, but should not preclude clmt from performing job duties.

Deal also reviewed Dr. Brutlag's July 16, 2002, and August 13, 2002, office notes, as well as Dr. Sanchez's July 11, 2002, office note.  These medical records did not change Deal's conclusions.  Deal reasoned that both of Dr. Brutlag's office notes reflected that Wakkinen experienced substantial improvement after trigger-point injections and that Dr. Brutlag did not impose any work restrictions.  Moreover, Deal noted that Wakkinen informed Dr. Sanchez that he wanted to change his disabling condition to fibromyalgia so that he would receive disability benefits for a longer time.  Deal further observed that Wakkinen reported to Dr. Sanchez that his then-current medication combination had been helpful; that he was sleeping much better at night; and that he was in no acute distress.  Finally, Deal noted that Dr. Sanchez recommended that Wakkinen remain very active.

Following Deal's review of Wakkinen's submissions, John M. Bolinger, M.D., reviewed the submissions.  Dr. Bolinger, a physician board-certified in psychiatry, concluded that the diagnosis of major depression, recurrent, was supported by the information in the file and that the restrictions and limitations imposed from December 3, 2001, through April 8, 2002, were similarly supported.  He, like Deal, further concluded that the restrictions were not supported

thereafter.   He reasoned that, based on the medical records of Drs. Bebchuk and Stormo, Wakkinen's depression was of mild severity and, as such, did not prohibit occupational functioning.  Dr. Bolinger recognized that Wakkinen reported some "backsliding" in a telephone conversation with Dr. Bebchuk in late May, but noted that when Dr. Bebchuk saw Wakkinen again, Wakkinen's symptoms were of mild severity and his mood was better.  Moreover, Dr. Stormo's June 27 and July 16, 2002, notes did not report a significant relapse or regression.

On September 24, 2002, UNUM informed Wakkinen by telephone that his claim for disability benefits would be denied because he was not disabled from his occupation throughout the entire 180-day elimination period.  In a letter dated October 7, 2002, UNUM explained that decision.  The Court reproduces the relevant parts of that letter verbatim below:

> [A]lthough the diagnosis of major depression, is supported, the restriction and limitations are supported from the date of disability, 12/3/01 to 4/8/02, but not beyond that date.  It's noted that while there are some residual symptoms that do remain, they do not appear of severity to prohibit occupational functioning.  The records reflect your medications were adjusted during the 1/10, 2/07, 3/12 and 4/8/02 visits, with gradual improvement noted.  On 5/20/02, Dr. Bebchuk indicates you were in partial remission, your activity level had increased and you were released to return to work on a part time basis.  On 5/28/02 and 5/31/02 you phoned Dr. Bebchuk expressing concerns about returning to work, however, at your next follow up visit of 6/27/02, your condition is assessed as mildly severe, your mood and energy is better, and the examination is essentially normal.
>
> The medical records from Dr. Brutlag, Dr. Stroma, and Dr. Sanchez do not provide work restriction.  In fact, on July 11, 2002, it's noted that Dr. Sanchez encouraged you to remain very active, by participating in daily programs of fitness and not by staying home being inactive.  You also reported that your current medications were helping, you were sleeping better and were in no acute distress.  Additionally, the treatment with Dr. Stroma is appropriate for your condition, but should not preclude you from performing your job duties.
>
> In summary, it appears from the information currently available, there is insufficient support for a sickness or injury causing a loss of functional capacity that would prevent you from performing the material and substantial duties of your regular occupation.  It is important to note that a diagnosis in and of itself does not necessarily equate to a disabling condition.  There must be medical

evidence supporting occupational restrictions and limitations.   Therefore, your claim for Long Term Disability has been denied.

       If you have new, additional information to support your request for disability benefits, please send it to . . . the address noted on this letterhead.

Wakkinen timely appealed UNUM's decision and submitted additional material for UNUM to consider.  His claim was reassigned to a Senior Appeals Specialist.  Shortly thereafter, Latisha Hailes, R.N., reviewed Wakkinen's submissions.   She opined that the information Wakkinen submitted did not support a conclusion that Wakkinen was unable to function as a result of either a psychiatric or physical impairment.  With respect to Wakkinen's depression, Hailes reasoned that, during the early period of Wakkinen's leave, Dr. Bebchuk identified Wakkinen's depression as severe but thereafter opined that the depression was mild or in partial remission.  Similarly, Hailes noted that Dr. Stormo opined that Wakkinen's depression was of moderate severity.  With respect to Wakkinen's fibromyalgia, Hailes reasoned that Wakkinen had been living with the condition for a significant amount of time and yet continued to function. Moreover, she noted that Dr. Sanchez recommended that Wakkinen maintain a high level of activity.  In sum, Hailes did not dispute Wakkinen's physicians' diagnoses but concluded that his conditions were not so severe that he was unable to function occupationally.

On December 19, 2002, Dr. Bolinger also reviewed the additional material Wakkinen submitted in support of his appeal.  He observed that the additional information submitted included a Family and Medical Leave Act form submitted by Dr. Bebchuk in February 2002 and work excuses from December 2001 through the end of July 2002, but did not include any additional office notes or any other evidence that would warrant a change in his original conclusion.  Dr. Bolinger therefore persisted in his opinion that the information Wakkinen submitted was not sufficient to demonstrate ongoing disability secondary to a psychiatric

diagnosis. He concluded that Wakkinen could have returned to work as of May 20, 2002, if he were so motivated.

Finally, on December 20, 2002, Stephen G. Jacobson, M.D., a physician board-certified in occupational medicine, reviewed Wakkinen's claim file. Dr. Jacobson indicated that his report was based on his review of the medical information in the file, including previous reviews. Dr. Jacobson focused his review on Wakkinen's claim that he was totally disabled by his fibromyalgia, chronic fatigue, and other physical ailments. With respect to Wakkinen's claim that he was totally disabled as a result of his fibromyalgia, Dr. Jacobson concluded that Dr. Brutlag's October office note indicating that Wakkinen had been continuously disabled by fibromyalgia from August 2002 was not supported by the record. Dr. Jacobson maintained that Dr. Brutlag's opinion was contradicted by her July office note. Dr. Jacobson reiterated Dr. Sanchez's opinion that Wakkinen would be better off if he remained active and participated in a daily fitness program. Dr. Jacobson wrote:

> Dr. Brutlag wrote "totally disabled August 1, 2002 through November 15, 2002 due to fibromyalgia, chronic fatigue, and severe chronic pain." The file does not appear to contain documentation of clinic notes or evaluations of Mr. Wakkinen by Dr. Brutlag during these dates to support this conclusion. This statement appears to be inconsistent with the clinical findings reported by the doctor in July of 2002. July 16, 2002 Dr. Brutlag noted that Mr. Wakkinen reported improvement in symptoms substantially after bilateral upper quadrant trigger point injections performed May 28, 2002. At that evaluation Mr. Wakkinen also reported improved energy level and feeling better. He also reported being significantly more active. The record also noted that Mr. Wakkinen reported walking consistently as well as performing yoga and meditation. On exam, the doctor noted that Mr. Wakkinen was alert, very talkative, and sitting with good posture. The doctor noted that Mr. Wakkinen had a broad range of affect and normal rate, rhythm, and intonation of speech. The doctor noted that Mr. Wakkinen followed three-part instructions without difficulty. Exam noted that Mr. Wakkinen changed positions freely without obvious discomfort and demonstrated nonantalgic gait pattern with balance, stability, and coordination intact. There was moderate limitation of cervical range of motion and as well as persistent very mild weakness in the intrinsic muscles of the left-hand compared to the right. August 13, 2002 Dr. Brutlag noted that Mr.

Wakkinen reported some increase in symptoms over the last week with pain increasing in association with static head positioning and repetitive arm use. Mr. Wakkinen reported that he continued to walk and participate in yoga and meditation. Exam noted that Mr. Wakkinen was alert, cooperative and sitting with the posture of mild increased thoracic kyphosis with head in forward position. Dr. Brutlag noted that Mr. Wakkinen demonstrated a broad range of affect and normal rate, rhythm, and intonation of speech as well as able to follow three-part instructions without difficulty. He was noted to change positions freely without obvious discomfort. Manual muscle testing noted grade 5/5 symmetrical strength of upper extremities with again slight weakness in the intrinsic muscles of the left-hand compared to the right. The noted treatment was trigger point injections, exercise, and follow-up in two to the three months. In summary, the file does not contain documented clinical findings or tests to support functional limitations and associated restrictions and limitations for the reported fibromyalgia . . . . The record contains documentation to support a conclusion that Mr. Wakkinen should remain active and participate in a daily fitness program. Dr. Sanchez, internist, 7/11/02 noted that "I believe that the patient will also be better off if he keeps busy with his work as a volunteer involving community issues with his church, etc. I do note [sic] believe that he will be better off staying at home being inactive." In conclusion, the record does not contain medical documentation to support R&Ls for the reported fibromyalgia but does support some limitations for the cervical disc disease.

With respect to Wakkinen's claim that chronic fatigue rendered him unable to perform his job, Dr. Jacobson reflected that Wakkinen's April 2002 sleep study did not support a diagnosis of sleep apnea and that the record supported a conclusion that his liver, thyroid, cardiovascular, and pulmonary systems were functioning normally. Thus, in his opinion, the record did not support functional limitations for his reported complaints of fatigue.

By letter of January 15, 2003, UNUM affirmed its decision denying Wakkinen's claim for benefits. UNUM reasoned that Wakkinen's psychiatric records revealed that his depression was in partial remission by May 20, 2002, and was described as mild as of June 27, 2002. Moreover, UNUM reasoned that Wakkinen's fibromyalgia did not render him unable to work. UNUM noted that Wakkinen had been diagnosed with fibromyalgia for a significant amount of time and had managed to continue to function, that one of Wakkinen's doctors recommended that he remain active, that Dr. Brutlag's note indicating that Wakkinen had been totally disabled

from August through November 2002 due to fibromyalgia was not supported by clinic notes or evaluations and was inconsistent with Dr. Brutlag's July 2002 clinical findings, and that the August 13, 2002, office note did not support a finding of disability.

With UNUM's permission, on May 1, 2003, Wakkinen again appealed the denial of his claim for benefits.  In support of his appeal, Wakkinen submitted evidence of his job duties and work history; articles about fibromyalgia; his pre-diagnosis activities and hobbies; letters from his children and ex-wife; and additional medical records.  He represented that his position was fast paced and demanding, and that it required that he consistently work fifty to sixty hours per week.  He also submitted evidence that, on February 13, 1998, he had been diagnosed with fibromyalgia after testing positive for tenderness on thirteen of the eighteen fibrocystic tender points.  Finally, he summarized his medical history, concluding by relaying that "[t]he most debilitating of [his] symptoms is his overwhelming fatigue."

Wakkinen's claim file was reassigned to a different Senior Appeal Specialist.  Hailes again reviewed Wakkinen's submissions, and concluded that the new information did not alter her opinion.  Similarly, Dr. Jacobson again reviewed Wakkinen's submissions, noting that his report was a no-deference review with the analysis limited to non-psychiatric conditions.  He also concluded that Wakkinen's new submissions did not warrant a change in his original conclusions.

By letter of July 30, 2003, UNUM informed Wakkinen that it had conducted a second appellate review of his claim and, after considering the additional information he had provided, determined that it had properly concluded that "the new medical information would not support restrictions and limitations that would have precluded Mr. Wakkinen from performing the duties

of his occupation beyond May 31, 2002." As a result, Wakkinen would not have been considered totally disabled throughout the 180-day elimination period.

On March 1, 2004, Wakkinen again appealed UNUM's decision. In support of his appeal, he attached, among other things, letters from Dr. Brutlag and Dr. Bebchuk disputing UNUM's conclusion that Wakkinen was not disabled. By letter of May 13, 2004, UNUM responded to Wakkinen's submission of additional information. In that letter, UNUM indicated that it had submitted the additional information he provided to its medical department for review; that it was upholding its decision for a third time; and that he had exhausted his administrative appeals. Wakkinen then brought this lawsuit.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Standard of review**

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).   Typically, a court reviews de novo a denial of benefits challenged under that section. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id.*

Here, Wakkinen argues that there is no discretion-conferring language in the operative Policy.   According to Wakkinen, the Policy in the administrative record contains discretion-conferring language only in the certificate of insurance section, and the certificate section is not part of the Policy.   The Court disagrees.   The cover page of the Policy in the administrative record specifically makes the certificate section part of the Policy.   The cover page states:

> Unum Life Insurance Company of America (referred to as Unum) will provide benefits under this policy.   Unum makes this promise subject to all of this policy's provisions.
>
> The policyholder should read this policy carefully and contact Unum promptly with any questions.   This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.   This policy consists of:
>
> -      all policy provisions and any amendments and/or attachments issued;
> -      employees' signed applications; and
> -      the certificate of coverage.

The certificate of coverage, in turn, provides:

> UNUM Life Insurance Company of America (referred to as Unum) welcomes you as a client.

This is your certificate of coverage as long as you are eligible for coverage and you become insured.  You will want to read it carefully and keep it in a safe place.

. . . .

The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

In sum, the certificate of coverage in the record contains discretion-granting language; the certificate of coverage is, by the terms of the Policy itself, part of the Policy.  Thus, the Court rejects Wakkinen's argument that the Policy does not contain discretion-conferring language.

Wakkinen next argues that, even assuming the Policy does contain discretion-conferring language, a sliding scale standard of review is appropriate in this case.  To obtain a less deferential standard, Wakkinen "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998).

Wakkinen first asserts that UNUM operated under a conflict of interest when deciding Wakkinen's claim for benefits because UNUM is both the insurer and the administrator for the Plan.  Wakkinen has offered evidence that the Department of Labor and regulators from the fifty states conducted an investigation of UNUMProvident's claims handling practices and concluded that its practices were troublesome.[1]  Wakkinen has not, however, offered any evidence of how UNUM's alleged conflict of interest had any connection to the substantive decision to deny benefits in this particular case.  Under these circumstances, Wakkinen's assertion is insufficient

---

[1]    UNUM moved to strike this evidence.  The Court denies the motion.

to trigger a less deferential standard of review. *See Chronister v. Baptist Health*, 442 F.3d 648, 655 (8th Cir. 2006) (rejecting claim of financial conflict of interest where plaintiff presented no evidence that the alleged financial conflict had a connection to the substantive decision reached); *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) ("Torres presented no evidence that UNUM denied his claim because it was financially advantageous for it to do so."); *Davolt v. Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809 (8th Cir. 2000) (explaining no automatic conflict of interest where the insurer of a benefits plan is also the plan administrator). The Court declines to adopt Wakkinen's implicit proposal that all UNUM claims determinations, regardless of the facts of each individual case, be subject to heightened scrutiny.

Wakkinen further argues that there were multiple procedural irregularities that affected UNUM's decision to deny his application for benefits. Specifically, he alleges that UNUM lacked judgment in accepting the opinions of its in-house physicians; failed to have health care professionals with appropriate training and experience evaluate his claim; failed to conduct an independent review on appeal; took longer than allowed to determine his claim and failed to follow other internal UNUM procedures; and failed to include the requisite perfection language in its initial denial letter.

The Court turns first to Wakkinen's assertion that UNUM's decision should be reviewed under a less deferential standard of review because UNUM lacked judgment in accepting the opinions of its in-house physicians. Preliminarily, the Court notes that a plan administrator's reliance on the opinions of its in-house physicians is not, by itself, a procedural irregularity warranting a less deferential review of the plan administrator's denial decision. *See Kolosky v. UNUM Life Ins. Co. of Am.*, No. 05-1364, 2006 WL 1379633, at *2 (8th Cir. May 22, 2006) (unpublished). Further, whether the in-house physicians' opinions and the plan administrator's

reliance on those opinions are reasonable are distinct inquiries from the inquiry required when determining what standard of review to apply. *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006). At this stage, the Court is directed to determine whether the administrator's decision was "made without knowledge of or inquiry into the relevant circumstances and merely as a result of its arbitrary decision or whim." *Id.* In this case, the record reveals that multiple medical reviewers carefully examined Wakkinen's many submissions in detail. Thus, upon review of the record, the Court is not persuaded that this is a case "where the plan trustee failed to inquire into the relevant circumstances at issue, or never offered a written decision that can be reviewed, or committed irregularities so severe that the court 'has a total lack of faith in the integrity of the decision making process.'" *Id.* Rather, as in *Pralutsky*, "[w]hat we have here is a dispute over whether . . . the record supports the administrator's exercise of judgment that benefits should be denied based on the evidence that was presented." *Id.* Accordingly, the Court declines to subject UNUM's decision to heightened scrutiny as a result of its decision to rely on its in-house physicians' conclusions.

The Court turns next to Wakkinen's claims that UNUM failed to have health care professionals with appropriate training and experience evaluate Wakkinen's claim and failed to conduct an independent review on appeal. Wakkinen alleges that UNUM's ultimate decision was based primarily upon the reviews of Dr. Jacobson, who is board certified in occupational medicine, and that there is no evidence that Dr. Jacobson had any expertise with fibromyalgia. Wakkinen further asserts that Dr. Jacobson improperly consulted with and deferred to the physician who originally reviewed Wakkinen's claim, Dr. Bolinger. This deferral allegedly violated Wakkinen's right to an independent review of his claim on appeal.

At this stage, it is Wakkinen's burden to come forward with evidence that UNUM's decision was compromised due to a serious procedural irregularity. *See Woo*, 144 F.3d at 1160-61. Wakkinen has not, however, presented any evidence that Dr. Jacobson did not have expertise with fibromyalgia. Moreover, this is not a case where a plan administrator doubted the diagnosis of fibromyalgia. Rather, UNUM's position has consistently been that Wakkinen's fibromyalgia was not sufficiently severe during his elimination period to completely disable him from performing his occupation. Under these circumstances, the Court cannot conclude that having a physician board-certified in occupational medicine is a procedural irregularity.

Similarly, Wakkinen cannot satisfy his burden of demonstrating that UNUM failed to independently review his claim on appeal. First, Wakkinen bases his argument on the fact that Dr. Jacobson indicated that he consulted with Dr. Bolinger as part of his review. Wakkinen extrapolates from this statement that Dr. Jacobson therefore deferred to Dr. Bolinger. The record does not support this conclusion. Dr. Jacobson clearly indicated that he reviewed the medical information in the file. He made no suggestion that he deferred to Dr. Bolinger in reaching his conclusions. In fact, Dr. Jacobson specifically noted in his second review of Wakkinen's claim file that he conducted a no-deference review and that he limited his review to Wakkinen's claim that he was disabled as a result of fibromyalgia, chronic fatigue, and other physical ailments. Dr. Bolinger's review, on the other hand, was limited to Wakkinen's psychiatric ailments. Second, the Court notes that Dr. Jacobson was not the only medical consultant to review Wakkinen's claim on appeal. Hailes also reviewed Wakkinen's submissions. She did not participate in the initial decision in this case.

Next, Wakkinen claims that UNUM failed to timely consider his claim and appeals and to follow other UNUM internal procedures. The undisputed evidence in the record reveals that

UNUM's delay was caused, at least in part, by Wakkinen's and his physicians' failure to promptly submit medical records that UNUM required to make its decision. The delay was not, in other words, arbitrary, unjustified, or an indication of bad faith. Nevertheless, assuming that UNUM's delay was unjustified, Wakkinen has failed to demonstrate that these alleged procedural irregularities had any connection to the substantive decision reached. Accordingly, the Court rejects Wakkinen's argument that these alleged procedural irregularities warrant a less deferential standard of review. *See Chronister*, 442 F.3d at 655 ("It should be noted that the mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review." (quotations omitted)).

Finally, Wakkinen alleges that UNUM's October 2002 denial letter was deficient because it failed to provide a specific list of materials he needed to submit to obtain benefits. He alleges that this failure clearly impeded his ability to obtain a full and fair review. The Court is not persuaded. The October 2002 letter, as well as the later letters denying his appeals, detailed UNUM's perceived deficiencies with Wakkinen's evidence and invited him to provide additional information. Indeed, UNUM accepted additional submissions from Wakkinen on multiple occasions. Under these circumstances, the Court cannot conclude that the letter presents a serious procedural irregularity.

In sum, Wakkinen has not made the necessary demonstration to trigger a departure from the abuse of discretion standard. Accordingly, the Court reviews UNUM's denial of Wakkinen's claim for an abuse of discretion. Under that standard, a court must uphold the plan administrator's decision if it was "reasonable" or supported by "substantial evidence." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004). Substantial evidence is more than a scintilla but less than a preponderance. *Leonard v. Sw. Bell Corp. Disability Income Plan*,

341 F.3d 696, 701 (8th Cir. 2003).   Based only on the evidence that was before the plan administrator at the time the decision was made, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 794 (8th Cir. 2002) (quotations omitted).

**B.     Merits**

UNUM terminated Wakkinen's benefits because it determined that he was not continuously unable to perform his occupation throughout his elimination period as a result of sickness or injury.   The parties do not dispute that Wakkinen was, to some extent, disabled.   In fact, the parties agree that, at all relevant times, Wakkinen suffered from depression, fibromyalgia, and chronic fatigue syndrome.   Instead, the parties dispute whether these ailments were sufficiently severe that Wakkinen was unable to perform his job as a senior financial consultant from December 2001 through May 31, 2002.   According to UNUM, Wakkinen's disability was sufficiently severe through April 8, 2002, but his medical records thereafter demonstrate that he was able to function in his occupation.   Wakkinen, on the other hand, maintains that his disability has continuously been so severe since December 3, 2001, that he has not since been able to work in the occupation of a financial consultant.

The Court's review of the record reveals substantial evidence that Wakkinen was capable of returning to work in May 2002, prior to the expiration of his elimination period.   First, UNUM reasonably concluded that Wakkinen's major depressive disorder did not prevent him from returning to work in May 2002.   Dr. Bebchuk's and Dr. Stormo's office notes reveal that, as of late May and June, Wakkinen's depression was in partial remission and was of mild or moderate severity.   At that time, his activity level had increased; he was able to do household tasks,

including yard work; he had more ambition; and his fatigue had improved.  In fact, on May 20, 2002, Dr. Bebchuk encouraged Wakkinen to return to work part-time working up to full-time. The Court recognizes that following May 20, 2002, Dr. Bebchuk ultimately provided Wakkinen with two additional disability slips, one dated May 31, 2002, and the other June 27, 2002, cumulatively excusing Wakkinen from work through the end of July 2002.  However, UNUM could reasonably conclude that the disability slips were not justified.  Dr. Bebchuk did not examine Wakkinen or see him in person prior to writing the May 31 disability slip.  Further, as UNUM noted, both disability slips were arguably inconsistent with Dr. Bebchuk's June 27 office notes.  In those notes, Wakkinen's mood was described as better, he showed a reasonably full range of affect, he was alert and oriented in three spheres, his memory and concentration were within normal limits, and his insight and judgment appeared sound.  As he had on May 20, 2006, Dr. Bebchuk opined that Wakkinen's depression was of mild severity.   Under these circumstances, UNUM reasonably concluded that Wakkinen was not continuously unable to perform his occupation on account of his depression throughout his elimination period.

UNUM also reasonably concluded from Wakkinen's submissions that Wakkinen was not totally disabled by fibromyalgia throughout his elimination period.  The record reveals that two physicians with whom Wakkinen treated declined to excuse him from work on account of his fibromyalgia.   Specifically, in January 2002, Wakkinen requested a disability slip for fibromyalgia from his internist, Dr. Lehman.  Dr. Lehman declined to give him the slip, opining that Wakkinen's disability was primarily the result of psychiatric problems.  Similarly, in July 2002, Wakkinen requested a disability slip from another internist, Dr. Sanchez.  Dr. Sanchez did not offer such a slip and instead encouraged Wakkinen to remain active.  Moreover, although Dr. Brutlag opined that Wakkinen was and has been unable to perform his occupation because of his

fibromyalgia since August 2002, she did not impose any work restrictions or opine that Wakkinen was totally disabled by fibromyalgia from May through July 2002, despite the fact that she treated him during those months.  On the contrary, the record reveals that, as of May 2002, Wakkinen reported to Dr. Brutlag that he was walking or biking for an average of an hour per day and participating in an upper extremity weight program at least three times per week. Moreover, Dr. Brutlag began giving Wakkinen trigger-point injections on May 28, 2002, and those injections eased Wakkinen's pain for up to three weeks at a time.[2]  When Wakkinen returned in July to see Dr. Brutlag, he reported significant pain but was alert, very talkative, and demonstrated a broad range of affect.  Under these circumstances, the Court concludes that UNUM's position that Wakkinen was able to perform  his occupation during his elimination period notwithstanding his fibromyalgia is supported by substantial evidence in the record.

Finally, there is substantial evidence in the record supporting UNUM's conclusion that Wakkinen's chronic fatigue syndrome did not render him unable to perform his occupation throughout his elimination period.  The record does support Wakkinen's claim that, at some point, he developed chronic fatigue syndrome.  However, UNUM reasonably concluded that the fatigue did not render him unable to perform his job during the 180-day elimination period. Preliminarily, the Court notes that Wakkinen's April sleep study was inconclusive.  More importantly, not one of Wakkinen's physicians opined that chronic fatigue syndrome limited him from performing his job at any time between December 2001 and June 2002.  In fact, on May 20, 2002, Wakkinen reported to Dr. Bebchuk that his fatigue was improving and, in July, reported to Dr. Brutlag that the trigger-point injections helped with his fatigue as well as his pain.  Finally,

---

[2]     During Wakkinen's June 27, 2002, office visit with Dr. Bebchuk, Wakkinen told Dr. Bebchuk that when his pain was controlled with the trigger-point injections, he felt better than he had in years.

as UNUM noted, Wakkinen's extensive exercise regimen and the fact that he did not seek treatment or further evaluation for poor sleep hygiene independent of his fibromyalgia weighs against a finding that Wakkinen's fatigue rendered him unable to work in a primarily sedentary position throughout his elimination period.

For the foregoing reasons, UNUM's decision to deny Wakkinen's claim for LTD benefits is supported by substantial evidence. The Court therefore grants UNUM's motion for summary judgment and denies Wakkinen's motion for summary judgment.

## III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      UNUM's Motion for Summary Judgment [Docket No. 19] is GRANTED.

2.      Wakkinen's Motion for Summary Judgment [Docket No. 12] is DENIED.

3.      UNUM's Motion to Strike [Docket No. 34] is DENIED.

4.      This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 6, 2006

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge